# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: Dale R. Larson<br><br>and<br><br>Christina S. Larson,<br><br>            Debtors.<br><br>-------------------------------------------------<br><br>Dale R. Larson,<br><br>          Plaintiff,<br><br>v.<br><br>United States of America,<br>on behalf of the Department of Education<br><br>        Defendant | Bankruptcy No.  08-B-09196<br>Adversary No. 08-A-00567<br>Chapter 7<br>Judge Manuel Barbosa |

## MEMORANDUM OPINION

This matter comes before the Court on an adversary proceeding brought by the plaintiff, Dale Larson ("Mr. Larson" or the "Plaintiff"), against the defendant, U.S. Department of Education (the "Department"), seeking a determination that the debt owed by Mr. Larson to the Department (the "Student Loan") is dischargeable under 11 U.S.C. § 523(a)(8).  For the reasons set forth herein, the Court finds in favor of the Plaintiff that the Student Loan is dischargeable.

## A.   JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal

Operating Procedure 15(a) of the United States District Court for the Northern District of

Illinois.  It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## B.   FACTS AND BACKGROUND

The following facts and procedural history are taken from the Debtors' Complaint to

Determine Dischargeability of Student Loans, the Department's Answer and Affirmative

Defenses to the Complaint, and from the testimony and evidence presented and admitted at the

evidentiary hearing held on February 25, 2010, including the joint Stipulations filed by the

Plaintiff and the Department in connection therewith.

Mr. Larson is currently 58 years old. He attended Waubonsee Community College in

Sugar Grove, Illinois from 1969 to 1971, and Northern Illinois University in DeKalb, Illinois

from 1971 to 1972, but did not obtain a degree. Later in life, he decided to go back to school, so

in 1991, he began attending classes at DeVry Institute of Technology in Chicago in their

computer information science program.  He took classes until around 1993, but he did not

graduate.  He already suffered from diabetes before he began at DeVry, but starting in 1993 he

began to lose his vision.  His vision continued to deteriorate, and by 1998 he was completely

blind, as he remains today.

Mr. Larson funded his educational costs at DeVry through student loans arranged by

DeVry.  On April 2, 2000, he consolidated his unpaid student loans, which had a balance of

$37,250 at the time, through a consolidated loan (the "Student Loan") from the United States

Department of Education (the "Department") under the Federal Direct Consolidation Loan Program. At that time, he elected to repay his student loans under the income contingent repayment plan ("ICRP") offered under the Federal Direct Consolidation Loan Program. Under the ICRP, the payment due each month varied based on annual income, and if the borrower's income was below a certain level, there was no required payment. Also under the ICRP, if the borrower complied with the plan, after 25 years any outstanding principal and interest would be cancelled. Between October and December 2000, Mr. Larson made three monthly payments of $261 each, and in May 2002, he was credited with a payment of $1,526. He has made no other payments on the Student Loan, but there is no indication that he was required to make any other payments under the ICRP. Because of accrued interest, as of December 5, 2009, the balance on the Student Loan was $67,231.68.

In 1999, Mr. Larson and his brother, Kurt, inherited the title to the house he currently lives at in Batavia, Illinois, from his father. In February 2001, Mr. Larson purchased his brother's interest in the house for $75,000, which he funded with a mortgage loan of $76,000. In May 2002, Mr. Larson refinanced the mortgage, borrowing $90,000. In October 2003, he refinanced it again, borrowing $105,000. In May 2004, he refinanced it, borrowing $131,000. In November 2004, he refinanced the mortgage, borrowing $150,000. Therefore, each time he refinanced the mortgage, he borrowed an additional $15,000 - $25,000. Mr. Larson was unclear how he used these surplus loan proceeds. He recalled using some of the money to replace the roof on the house, some to remodel a bathroom to fix a mold problem, and some to repair or replace the boiler and dishwasher. As of the petition date in April 2008, the Debtors estimated

the value of their house as of that date as $170,000 and the mortgage debt on the house as of that time as $159,000.

In early 2004, Mr. Larson suffered a heart attack, which required a quadruple bypass surgery. After the surgery, his doctors discovered that his kidneys had failed. They began dialysis in February 2004, which continued until February 2007, when he received a kidney transplant. His medical conditions appear to have stabilized, but he continues to need extensive medicines and check-ups. He takes several types of insulin for his diabetes, a blood thinner and other medications for his heart condition, several forms of anti-rejection medicine related to his kidney transplant, as well as pain medication. He also has to regularly see cardiologists and other specialists for his diabetes and in connection with his kidney transplant, as well as doctors in connection with his vision problems.

Mr. Larson works at Nicor gas as a customer service representative, monitoring sales calls. He has worked there since 1999, and is able to use specialized computer software to overcome his blindness. He has a guide dog, and commutes by public bus or by taxi when the bus is not running. He works 28 hours per week, four days a week, which is the most his doctors will allow him to work. He also receives disability payments through social security. His wife also has medical problems, and receives disability payments through social security.

Mr. Larson lives with his wife, who is his sole dependent. In 2008 or 2009, his brother began living with the Larsons after his divorce, but did not pay them rent. Mr. Larson makes $14.10 per hour at Nicor, or $1724 per month. From this, $229 is deducted for taxes and social security, $156 for health insurance, $35 for dental insurance, and $27 for life insurance. He also has $86 per month deducted to contribute to a 401(k) plan, for which Nicor makes a 90%

matching contribution. Currently, his 401(k) balance is around $7,500. He began making 401(k)

contributions in 2005. In 2007, he borrowed $750 from the 401(k), but was able to pay back the

loan in installments out of his subsequent paychecks. He also receives $1,241 in monthly social

security disability payments, and his wife receives $760 in disability payments and is

unemployed. Therefore, after withdrawals, his family's monthly take-home in income and

disability payments is $3,192.00.

Mr. Larson itemized his and his wife's average monthly expenses as $3,261.00.[1] Their

main expense is the mortgage, which is $1,394 per month. Medical expenses were listed at $280

per month. The Debtors listed veterinary expenses and dog care as $120 per month, but this is

reasonable since Mr. Larson has a guide dog because of his blindness. Cigarettes are listed at

$40 per month, but the Debtor indicated that his wife had cut this down from $150 from the time

of the petition in April 2008. Recreation was listed as $108 per month. The Debtors also listed

that they make charitable contributions of $80 to their church and listed $76 for "Lion Club."

Mr. Larson clarified that the $76 consists of $12 in dues, plus expenses he allocates to his

participation in the Batavia Lion's Club: $25 in transportation to get to and from meetings and

activities and a monthly average of $39 for the cost to maintain a personal computer. He has to

have a personal computer to perform his duties as vice president of the club, and in July will

become president of the Batavia branch. Mr. Larson also indicated that his computer is more

expensive than usual because he needs specialized equipment and software to accommodate his

visual impairment.

---

[1] In the Debtors' original Schedule I filed in April 2008 with their bankruptcy petition, they listed monthly expenses as $2,514.00, with a monthly net income of $418. However, the difference from now appears to largely stem from a scrivener's error, in which the food expense in the original schedule was listed as "$40" instead of "$400." Since the April 2008 petition, the Debtors' average monthly income has increased by about $250, and ignoring the scrivener's error, average monthly expenses have increased by about $300.

## C.   DISCUSSION

Under Section 523(a)(8), educational loans are presumptively nondischargeable unless a

Debtor can demonstrate that excepting such debt from discharge "will impose an undue hardship

on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8) (West 2010). There is no

dispute that the Student Loan is of the type of "educational loan" covered by Section 523(a)(8).

The only issue is whether discharging the debt would cause an "undue hardship" on the Debtors.

The Seventh Circuit has adopted the so-called "Brunner test" for determining "undue hardship."

Under this three-part test, the debtor bears the burden of demonstrating by a preponderance of

the evidence: "(1) that the debtor cannot maintain, based on current income and expenses, a

'minimal' standard of living for [himself] and [his] dependents if forced to repay the loans; (2)

that additional circumstances exist indicating that this state of affairs is likely to persist for a

significant portion of the repayment period of the student loans; and (3) that the debtor has made

good faith efforts to repay the loans." In re Roberson, 999 F.2d 1132, 1135 (7th Cir. 1993)

(citing Brunner v. N.Y. State Higher Educ. Servs. Corp., 831 F.2d 395 (2d Cir.1987)); see also

O'Hearn v. Educ. Credit Mgmt. Corp., 339 F.3d 559, 564 (7th Cir. 2003).

## I. MINIMAL STANDARD OF LIVING

For the first prong of the test, the court looks at the debtor's current monthly income and

expenses for himself and his dependents, but should disregard "expenses that are not necessary,

and, if eliminated, that would provide funds that could be directed toward repayment of the

loan." Clark v. U.S. Dep't of Educ. (In re Clark), 341 B.R. 238, 249 (Bankr. N.D. Ill. 2006)

(Squires, J.) (citing Berchtold v. Educ. Credit Mgmt. Corp. (In re Berchtold), 328 B.R. 808, 814

(Bankr. D. Idaho 2005)).  Necessary expenses include a debtor's and his dependents' needs for

basic necessities such as food, shelter, clothing and medical treatment.  See, e.g. In re Clark, 341

B.R. at 249.  A debtor is also "entitled to allocate a small amount of monthly income to

discretionary or recreational purposes, which allocation, by definition, is not for a necessity."

Vargas v. Educ. Credit Mgmt. Corp. (In re Vargas), 2010 WL 148632, at *3 (Bankr. C.D. Ill.

Jan. 12, 2010) (finding extra $44 for expanded cable and $50 per month in lottery tickets "neither

excessive nor unreasonable" where those were debtor's primary recreational expenses and in the

context of debtor's otherwise frugal budget, and $40 per month for cigarettes permissible for

long-term smoker who had cut down from $184). Debtors need not "live in abject poverty" to

meet the minimum standard of living element, but "are expected to live within the strictures of a

frugal budget for the foreseeable future."  In re Clark, 341 B.R. at 249 (internal citations

omitted).  Dischargeability requires "undue" hardship, and therefore the mere fact that a debtor

must make "major personal and financial sacrifices and to live within a restricted budget" is not

sufficient to justify a finding of undue hardship.  Id.  In addition to disregarding non-necessary

expenses, a court should also inquire "whether the debtor has any additional funds with which to

repay the student loan." Id.

The Plaintiff listed a combined average monthly income for Mr. Larson and his wife as

$3,192, and average monthly expenses of $3,261, not including any payments towards the

Student Loan.  As asserted and without modifying their current budget, the Debtors would have

no income to use towards repayment of the loan, and would in fact have an average monthly

shortfall of $69.  Mr. Larson testified that he and his wife currently have less than $500 in

savings, and that at no time in the last five years did his annual income exceed his annual expenses.

The Department argued that certain of the Debtors' expenses are not necessary within the standard for Section 523(a)(8) and should be disregarded or treated as funds available for the repayment of the Student Loan. The Department highlighted the $80 per month that the Debtors indicated they donate to their church, the $86 per month payroll deduction Mr. Larson takes to contribute to a 401(k) plan, and the $76 per month that Mr. Larson spends on or contributes to the Lion's Club of Batavia, totaling $242 per month, which the Department argued could be available towards repayment of the Student Loan.

The Department also noted that neither the costs in connection with the Lion's Club, nor the charitable contributions to his church were listed on the Debtors' original Schedule I. However, the Court does not believe this was an intentional omission or that the omission means that the Debtors only recently began donating or participating in the club. The Debtors' more recent estimate of expenses simply seems more detailed and more accurate than the original schedule. For example, the original schedule listed "entertainment" as "0," which, while admiral, also seems implausible. The original schedule also did not list certain items such as "trash removal" or "lawn & garden," which were included in the more recent estimate, but which the Court does not believe were new expenses. Given the Debtors' long-standing health issues, it is unlikely that they only recently found themselves needing to hire someone to help with the lawn. More likely, their experience going through a bankruptcy case has made them more attuned to their expenses and better at estimating and listing expenses and assets accurately. Overall, their more recent expense figures seem more realistic, if not still conservative.

### a.    Religious Donations

The Religious Liberty and Charitable Donation Protection Act of 1997 modified Section 548 and Section 1325(b)(2)(A) of the Bankruptcy Code to exclude charitable contributions made to a qualified religious organization in an amount up to 15 percent of a debtor's gross income from avoidance as a fraudulent transfer and from the definition of "disposable income" for purposes of plan confirmation in a Chapter 13 case, but the RLCDPA made no change to Section 523(a)(8).  Courts are split on whether Congress's silence was intentional, and what effect if any, the amendment to the other sections should have on analysis under Section 523(a).  Some courts have held that the intentional exclusion means that such religious donations are per se non-necessary expenses for purposes of Section 523(a). See, e.g., Fulbright v. U.S. Dep't of Educ. (In re Fulbright), 319 B.R. 650, 660 (Bankr. D. Mont. 2005) (holding that statutory interpretation demanded that Congress's omission be deemed intentional, and that any religious donation above a "de minimus" amount could not be considered a necessary expense).  Other courts have held that the RLCDPA's 15% safe harbor allowance should be incorporated into Section 523(a)(8). See, e.g., Durrani v. Educ Credit Mgmt. Corp. (In re Durrani), 311 B.R. 496, 504 (Bankr. N.D. Ill. 2004) (Hollis, J.), opinion aff'd on other grounds, 320 B.R. 357 (N.D. Ill. 2005) (noting that other courts had concluded that the disposable income standard in § 1325(b)(2) should be used for the "minimal living standard" analysis under §523(a)(8), and concluding that "a bankruptcy judge should not override a debtor's commitment to tithing"). A third line of cases has held that the RLCDPA had no effect on Section 523(a), and apply the pre-1997 standard, determining whether to consider religious donations necessary expenses on a case-by-case basis.

See, e.g., McLaney v. Ky. Higher Educ. Assistance Auth. (In re McLaney), 375 B.R. 666, 682 (M.D. Ala. 2007); Meling v. U.S. (In re Meling), 263 B.R. 275, 279 (Bankr. N.D. Iowa 2001) (finding that a $100 monthly tithe for a "deeply religious" debtor was reasonable and necessary under the circumstances). The Court does not believe that Congress's silence was meant to forbid religious donations under Section 523(a)(8), and finds that the Debtors' donations would be acceptable under either of the other two standards. Here, the Debtors' monthly donation is less than 5% of their earned gross income, and less than 3% of their gross income including social security. Not only is this below the 15% safe harbor in the RLCDPA, but it is also well below the 10% of gross income that the court in In re McLaney found to be "within the range of typical tithing." 375 B.R. at 682. The size of the donations themselves are not excessive, and when combined with the Debtors' other discretionary expenses they are not part of a pattern of excessive or unreasonable expenses or excessive in the aggregate. Therefore, in light of the Debtors' income and other expenses, the Debtors' religious donations are reasonable and necessary to their minimum standard of living.

### b.    Recreation

The Department also raised an objection to Mr. Larson's expenses in connection with the Lion's Club as an unnecessary expense. However, even under the minimal standard of living test, "[p]eople must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet." In re McLaney, 375 B.R. at 674 (internal citation omitted); see also In re Zook, 2009 WL 512436, at *8. Mr. Larson has chosen as his recreational activity to help his community by not only participating in the Lion's Club but by

taking a leadership role, despite his visual impairment. Moreover, while the $76 listed as an expense might seem excessive at first glance, it is reasonable when broken down into its elements and considered in context. Only $12 of the total $76 listed constituted dues. $25 was for transportation, which in light of the fact that the Debtors do not have a car, is again modest. While in some contexts a taxi ride can seem expensive, an occasional taxi ride in comparison to the costs of car ownership is miniscule. Most other debtors have cars, and the related expenses for even a low-end car, including car payments, insurance, gas and repairs, would far exceed all of the expenses that the Department objects to combined. The remaining $39 was for the personal computer he needs to maintain. It was not clear if this was the purchase price amortized into an average monthly expense or some sort of rental or service fee, but again seems reasonable, especially since Mr. Larson needs special software or equipment to accommodate his visual impairment.

### c.    401(k) Contributions

The Department also argued that the amount deducted from Mr. Larson's wages for 401(k) contributions are not necessary, and could be used towards loan repayment. Like religious donations, courts have split on whether 401(k) contributions should be excluded per se for "minimal living standard analysis." For example, in Perkins v. Penn. Higher Educ. Assistance Agency, the court stated that "401(k) contributions generally are not regarded as reasonably necessary for the support or maintenance of a debtor and thus may be considered as available income from which a debtor seeking a § 523(a)(8) undue hardship discharge could use to repay an educational loan." 318 B.R. 300, 306-07 (Bankr. M.D.N.C. 2004) (citing string of

cases).  On the other hand, other courts have exercised discretion based on the circumstances in

deciding whether to allow 401(k) contributions as reasonably necessary expenses for purposes of

Section 523(a)(8).  See, e.g., <u>Educ. Credit Mgmt. Corp. v. Savage (In re Savage)</u>, 311 B.R. 835,

843 (1st Cir. B.A.P. 2004) (noting that the "result may well differ with changes in a debtor's age,

accumulated savings, proximity to retirement, and earnings and expense forecast").  The Court

notes that a majority of courts have found that 401(k) contributions constitute disposable income

for purposes of Chapter 13 plans, at least where unsecured creditors are not to be paid in full.

See, e.g., <u>In re Hansen</u>, 244 B.R. 799 (Bankr. N.D. Ill. 2000) (Lefkow, J.) ("While investing for

retirement is financially prudent, it is not necessary expense for the support of debtors.... Such

investments are made with disposable income....").

     However, given Mr. Larson's age, minimal accumulated savings, meager income in

comparison with his expenses, and the fact that his employer matches 90% of his contributions,

as well as the relatively small amount of his contributions and the frugal nature of the rest of his

budget, the Court will find, based on these particular circumstances, that the Debtors' ability to

make the current 401(k) contribution does not mean that the Debtors would be able to maintain a

minimal living standard if they ceased the contributions and instead made payments on the

Student Loan.  The Court notes that it is <u>not</u> holding that the category of reasonably necessary

expenses includes 401(k) contributions.  Rather, the Court's determination is based on two

factors: the Debtors' overall 'belt-tightening,' and concern that the Debtors have understated

their likely future expenses.

     Just as a court should not be "in the business of deciding which recreational activities are

acceptable and which are not" so long as the overall total spent on discretionary expenses is

frugal, In re Vargas, 2010 WL 148632, at *3, a court should not punish a debtor who tightens his

budget to the limit to put a small amount away for the future or for a rainy day.  See, e.g., Zook

v. Edfinancial Corp., No 05-A-10019, 2009 WL 512436, at *9 (Bankr. D.D.C.  Feb. 27, 2009)

(noting that even if certain expenditures viewed in isolation seemed high or unnecessary, the

debtor's "overall expenditures are at a level consistent with maintaining a minimal standard of

living," so that those high expenditures "represent amounts that should be devoted to other

expenses that are necessities and that are not being met: a higher level of medical care, and a

reserve for practically inevitable future hard times").  If Mr. Larson has been able to take

advantage of his employer's contribution matching program and the tax advantages of the 401(k)

plan to provide for a future that might be only a few years away by tightening his family's

budget during the recent stable months, the Court will not punish him for doing so by denying

his discharge.  As the court in Zook stated:

> By the Defendants' logic, a debtor living well below the poverty level would be
> denied a discharge if the debtor, by foregoing a reasonable level of expenditure on
> clothing, spent part of his income on what would be considered luxury items, for
> example, cable or going out to dinner. A debtor whose income is insufficient to
> meet a minimal standard of living, taking into account the level of expenditures
> necessary for that purpose, ought not be denied a discharge of student loan debts
> based on the creditor's finding some item of expenditure that could be deemed a
> non-necessity. The Brunner test ought not be turned in that fashion into a game of
> "gotcha" based on viewing certain expenditures in isolation, wearing blinders that
> disregard the debtor's needs in a global fashion.

2009 WL 512436, at *9.  As mentioned above, the Debtors' listed expenses demonstrate on

overall frugal budget, and do not include many expenses considered necessary for others, such as

car payments and related costs. In light of this, the Debtors should not be punished for a modest

401(k) contribution.

Moreover, even though the Debtors have listed a monthly contribution of $86 per month, it is unlikely that this demonstrates that the Debtors can afford to make payments on the Student Loan. For example, even their current budget demonstrates a monthly deficit of $69, which is nearly equal to the amount currently contributed. Therefore, to a certain extent, the contribution is not really coming out of Mr. Larson's income, but is coming out of his meager savings. Moreover, the average monthly expenses the Debtor has estimated for variable expenses, such as home maintenance, medical expenses, and even utilities, seem so conservative that the Court wonders how the Debtors could manage if any unexpected expense or decrease in income arose, particularly in light of the Debtors' recent history of medical problems and necessary home repairs. See, e.g. McLaney, 375 B.R. 666, 675 (noting that "as a court examines a debtor's expense budget as a whole, it is appropriate for a court to take into account reasonably necessary items that are omitted, thereby creating, in the words of the bankruptcy court, 'an austere and even understated expense budget'"). The Debtors' history over the past several years shows numerous loans against their home equity through mortgage refinancings to meet living expenses, and at least one borrowing against Mr. Larson's 401(k). To a certain extent the Debtors' small amount of discretionary expenses represents a cushion against an unexpected expense, such as a future medical complication or necessary home repair. This is particularly true for the 401(k) contributions, for which the Debtors might be able to borrow against in an emergency, as they have done in the past.

### d.    Additional Sources of Income

The Department also argued that the Debtors' income should be adjusted to reflect their tax refund.  Since 2004 the Debtors have received federal tax refunds ranging from $128 to $1,166, and the Department estimated that the Debtors would receive a tax refund of around $900 for the year 2009.  It is true that the Debtors' estimated budget did not include this income, but as mentioned above, the budget also likely does not reflect potential unexpected costs and expenses that are nonetheless likely to occur in the future.  So, while a $900 annual tax refund would increase the Debtors' average monthly income by $75, such adjustment does not impact the Court's opinion that the Debtors' future expenses are unlikely to exceed their income. Therefore, even considering the tax refund as a source of income, the Court believes that the Debtors will not have future income which could be devoted to repayment of the Student Loan without adversely impacting their ability to maintain a minimal standard of living.

### e.    The Income Contingent Repayment Plan

Finally, the Defendant argued that, because Mr. Larson is on an income-contingent repayment plan, even if the Debtors have minimal income, compliance with the repayment terms of the plan will not cause the Debtors undue hardship.  Because Mr. Larson elected the income-contingent plan, he only has to make payments in an annual amount equal to 20% of the excess of his Adjusted Gross Income over the amount stated in the Department of Health and Human Services' poverty guidelines for a family of his size. See 34 C.F.R. § 685.209. This amount can be zero if the debtor's Adjusted Gross Income is less than the poverty level, and in fact, Mr. Larson had no obligation to make any payment on the Student Loan for the past five years.

However, the Department indicated that, based on the Debtors' current annual income, the required payment would be around $100 per month. After 25 years, if the debtor has complied with the plan, the outstanding balance and interest on the student loan would be cancelled.

Section 523(a)(8) places the discretion to determine the dischargeability of student loans with the bankruptcy judge, who "must not turn to the ICRP as a substitute for the thoughtful and considered exercise of that discretion." Durrani, 311 B.R. 496, 509. If Congress had desired to use a formula like the one used for the ICRP to determine dischargeability under Section 523(a)(8), it could have easily drafted such legislation. Id. Also, the standards for the ICRP and Section 523(a)(8), while perhaps related, are not the same. For example, the ICRP solely looks at income and the published poverty level, whereas the Brunner test compares the debtor's income to actual expenses. Thus, it is possible that the ICRP calculation could determine that a debtor had the ability to pay while the Brunner test would not. This is especially possible if the debtor had extensive medical expenses, which would be considered "necessary" expenses under Brunner, but would be ignored under the ICRP. Thus, even if the Debtors were not required to make payments currently, if the debt is not discharged they could find themselves being forced to make payments that would be an undue hardship if their income increases but their medical expenses increase at a faster rate. Also, even if the Debtors were not required to make a single payment on the Student Loan, until it was ultimately cancelled in 15 years, they could still bear costs that they would not bear if granted a discharge.

They would bear an emotional and a social toll. One of the fundamental policy goals of bankruptcy is to give a 'fresh start' to "honest but unfortunate" debtors. See, e.g., Grogan v. Garner, 498 U.S. 279, 286-87 (1991). Section 523(a)(8) was designed in part to prevent abuse of

the bankruptcy system, by preventing recent student borrower graduates, who often have few

assets and high debt, from exploiting that short-term insolvency to wipe away the cost of their

education while reaping the benefits of the education during the rest of their lives.  However,

there is no evidence of such abuse by the Debtors or evidence that it would be unjust to discharge

the Student Loan.  On the other hand, denying the Debtors their discharge would deny them their

"fresh start."  Even if they were ultimately not required to make any payments on the Student

Loan, the debt would still hang over their heads, affecting their credit, and causing a

"psychological and emotional toll."  In re Durrani, 311 B.R. 496, 507-08.  Also, at the end of the

25 years, if the debt were cancelled by the Department under the ICRP, the cancellation could

have potential adverse tax implications on the Debtors, since unlike a discharge in bankruptcy,

the cancellation would be treated as income for tax purposes.  Id.  Moreover, the Department has

indicated that based on the Debtors' current income, they might have to make actual payments of

up to $100 per month currently, which as discussed above, would adversely affect the Debtors'

ability to maintain a minimal standard of living.

## II. ADDITIONAL CIRCUMSTANCES TO INDICATE THE DEBTOR'S STATE OF AFFAIRS WILL PERSIST

A debtor must demonstrate that his inability to pay is not just a temporary circumstance,

and must demonstrate a "certainty of hopelessness."  In re Clark, 341 B.R. 238, 252 (citing

Goulet v. Educ. Credit Mgmt. Corp., 284 F.3d 773, 778 (7th Cir. 2002)).  This is "a tough

standard and one that can generally ... be met [only] by the truly disabled or debtors whose

repayment periods have already run so that the certainty of their inability to pay for the entire

period is a matter of fact rather than speculation." In re Clark, 341 B.R. at 252 (internal citation omitted).

Such standard is met here. Mr. Larson works only 28 hours per week, but is unable to work more hours. He testified that his doctors would not permit him to work more than 28 hours per week for health reasons. Nor is he likely to find a higher paying job. Due to his visual impairment, he stated that he feels fortunate to have the job that he does. Additionally, the Debtors' health problems are not of a short-term nature and are unlikely to change for the better in the future. Although Mr. Larson had a kidney transplant and his heart condition has stabilized, there is no reason to believe he will regain his vision in the future, and he could have potential relapses or complications from his heart condition or diabetes, or could suffer other medical conditions. For most of the medicines he takes, he indicated that he will have to take them indefinitely. While Mr. Larson gets annual raises, at the same time the Debtors have to struggle with increasing costs of living. While the future is always unknowable, there are no foreseeable prospects for a change in circumstances that would increase the Debtors' ability to repay the Student Loan.

### III. GOOD FAITH ATTEMPT TO REPAY

Under the "good faith" prong, the debtor's financial distress cannot be of his or her own creation. In re Clark, 341 B.R. at 249. Thus, it involves an inquiry into "whether the debtor was negligent or irresponsible in conducting his financial affairs such that the debtor's misfortune is self-imposed." Roberson, 999 F.2d at 1136. The debtor is not required to have paid a certain percentage or minimum amount of the loan in order to show good faith. In re Clark, 341 B.R. at

255. "A debtor's failure to make any payments does not prevent the court from making a finding of good faith where the debtor never had the resources to make such payments." <u>Id</u>. However, to meet the good faith test, a debtor must take advantage of one of the repayment plans available to her if and when she is able to do so. <u>Id</u>.

Here, Mr. Larson's health problems only began after he had borrowed the initial student loan and had begun classes. He was suffering diabetes before starting school, but did not begin to lose his vision until two years later. It was five years later that he completely lost his sight. His kidney failure and quadruple by-pass were seven years after that. Therefore, it was unlikely that he knew at the time he borrowed the funds that he would be unable to complete his education or be unable to repay the loans. And, his inability to do so was caused by external forces, such as unanticipated medical conditions. There are similarly no indications that his financial distress or bankruptcy were "self-imposed" or caused by excessive spending.

Mr. Larson chose the most flexible repayment plan that was offered. Neither party discussed the payment history of the initial loan, but he made three payments of $261 each in late 2000 on the consolidated loan, and was credited with another payment in May 2002. While this is a low number of payments over ten years, it is likely that he was not required to make any other payments during that time because of the repayment plan. The Department has not alleged or offered evidence that the Debtors failed to make any payment on the Student Loan that was required under the repayment plan.

The Department noted that there were several times during the life of the Student Loan when Mr. Larson had cash, and implied that he should have used the money to repay the loan. First, the Department noted that Mr. Larson bought his brother's interest in the house they

inherited for $75,000 in February 2001. But, he took out a mortgage on the house to make that payment. Mr. Larson should not have been forced to borrow from one lender to pay another. Moreover, it is likely that the mortgage lender would not have lent the funds unless Mr. Larson's brother released his interest in the house. The Department also noted that Mr. Larson refinanced the mortgage several times between 2002 and 2004, in each case refinancing for an amount $14,000 - $25,000 greater than the prior initial balance. With respect to the November 2004 refinancing, the Department demonstrated that Mr. Larson received a cash distribution of around $13,000. But, there is no indication that he was obligated under the repayment plan to use any such borrowed funds to repay the Student Loan. Nor is there any indication that he used any of the funds on luxuries or non-necessary expenses. Mr. Larson could not recall in detail how the various borrowed funds were used, but testified that he used at least some of the funds to repair the house's roof, to replace the boiler and dishwasher, and to remodel one of the bathrooms to fix a mold problem. Additionally, at least several of the refinancings took place around the same time that he had severe medical emergencies, including his quadruple by-pass surgery and his kidney failure requiring dialysis. Therefore, the Court holds that the Debtors have demonstrated a good faith attempt to repay the Student Loan.

### D    CONCLUSION

For the foregoing reasons, the Court finds in favor of the Plaintiff and declares the Student Loan dischargeable.

THEREFORE, IT IS ORDERED that

the foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P.

52(a) and Fed. R. Bankr. P. 7052.  A separate order shall be entered pursuant to Fed. R. Bankr. P.

9021 giving effect to the determinations reached herein.

DATE: March 25, 2010

The Honorable Manuel Barbosa
United States Bankruptcy Judge